FILED & ENTERED

AUG 25 2017

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY tatum        DEPUTY CLERK

**NOT FOR PUBLICATION**

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF CALIFORNIA

LOS ANGELES DIVISION

| | |
|---|---|
| In re: | Case No. 2:12-bk-47099-RK |
| ADRIAN J. HERNANDEZ, | Chapter 7 |
|      Debtor. | Adv. No. 2:15-ap-01580-RK |
| JAIME FARIAS and MYRNA FARIAS, | |
|      Plaintiffs, | MEMORANDUM DECISION ON PLAINTIFFS' ADVERSARY COMPLAINT TO DETERMINE DISCHARGEABILITY OF DEBT |
|    v. | |
| ADRIAN J. HERNANDEZ, | |
|      Defendant. | |

     This adversary proceeding came on for trial before the undersigned United States Bankruptcy Judge on November 17, 2016 on the complaint of Plaintiffs Jaime Farias and Myrna Farias ("Plaintiffs") against Defendant Adrian J. Hernandez ("Defendant"), the debtor in the underlying bankruptcy case, for determination of dischargeability of debt under 11 U.S.C. §§ 523(a)(2)(A), (a)(4), and (a)(6).  Michael Jay Berger, of the Law

1  Offices of Michael Jay Berger, appeared for Plaintiffs.  Eric Bensamochan, of The

2  Bensamochan Law Firm Inc., appeared for Defendant.

3        On November 5, 2012, Defendant commenced the underlying bankruptcy case by

4  filing a voluntary petition for relief under Chapter 7 of the Bankruptcy Code, 11 U.S.C.

5  Admitted Fact 2.8, Joint Pre-trial Stipulation, ECF 24, filed on July 26, 2016.  On

6  November 6, 2015, Plaintiffs commenced this adversary proceeding against Defendant

7  by filing their complaint for determination of dischargeability of debt under 11 U.S.C. §§

8  523(a)(2)(A), (a)(4), and (a)(6).  Adversary Complaint for Non-Dischargeability of Debt,

9  ECF 1, filed on November 6, 2015; Admitted Fact 2.19, Joint Pre-trial Stipulation, ECF

10  24.  This court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §

11  157(a) and (b).  Admitted Fact 1.1, Joint Pre-trial Stipulation, ECF 24.  Venue is proper in

12  this judicial district in that this adversary proceeding is related to a case under the

13  Bankruptcy Code, 11 U.S.C., pursuant to 28 U.S.C. § 1409(a).  Admitted Fact 1.2, Joint

14  Pre-trial Stipulation, ECF 24.

15

16        Having considered the testimony, exhibits and other evidence received at trial, the

17  oral and written arguments of the parties, the proposed findings of fact and conclusions of

18  law, lodged by the parties, ECF 58, lodged on February 7, 2017, and ECF 60, lodged on

19  March 7, 2017, and objections thereto, ECF 59, filed on March 6, 2017, and ECF 61, filed

20  on April 7, 2017, and the record before the court, the court hereby sets forth in this

21  memorandum decision its findings of fact and conclusions of law pursuant to Rule 7052

22  of the Federal Rules of Bankruptcy Procedure and Rule 52 of the Federal Rules of Civil

23  Procedure.

24

25

26                                            **FACTS**

27

28

2

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Defendant was a real estate broker licensed in the State of California on November 13, 2007.  California Bureau of Real Estate's Broker license information for Adrian Hernandez, Plaintiffs' Trial Exhibit 27;  California Department of Real Estate's Order to Desist and Refrain filed on August 25, 2011, at 2, Findings of Facts, ¶ 2, Plaintiffs' Trial Exhibit 1.  Defendant's licensing information with the State of California indicates that his license status is listed as "SURRENDERED" in connection with a disciplinary actions and/or an enforcement investigation.  *Id.*  By order filed on August 7, 2013, the California Department of Real Estate ("DRE") accepted the voluntary surrender of Defendant's real estate broker's license, effective on August 27, 2013.  Admitted Fact 2.17, Joint Pre-trial Stipulation, ECF 24; California Department of Real Estate's Order Accepting Voluntary Surrender of Real Estate License of Adrian Hernandez with Adrian Hernandez's Declaration, Plaintiffs' Trial Exhibit 26; *see also,* Admitted Fact 2.12, Joint Pre-trial Stipulation, ECF 24 ("Debtor's schedule I filed with this Court on November 15, 2012 lists Debtor as a self-employed real estate broker with 6 years of employment.")

On or about June 8, 2007, Diana Lopez ("Lopez") formed L.D.T. Investments, Inc. ("LDT"), as a California corporation.   Articles of Incorporation, L.D.T. Investments, Inc., filed with California Secretary of State on June 8, 2007, Defendant's Trial Exhibit B; California Secretary of State Business Entity Detail for L.D.T. Investments, Inc., Defendant's Trial Exhibit A.  On its Statement of Information filed with the California Secretary of State on December 13, 2010, LDT stated that its type of business was "Real Estate Investments."  California Secretary of State statement of information for LDT Investments, filed on December 13, 2010, Defendant's Trial Exhibit D.  Lopez was LDT's owner and president and was not a licensed real estate broker or agent.  California Department of Real Estate's Order to Desist and Refrain filed on August 25, 2011,

3

Plaintiffs' Trial Exhibit 1; Trial Testimony of Defendant, Transcript of Trial, ECF 48 at 72-73.  On March 11, 2011, LDT's corporate status was suspended by the California Secretary of State, although LDT continued to conduct its operations.  Admitted Fact 2.2, Joint Pre-trial Stipulation, ECF 24.

In February 2009, Defendant met Lopez.  Defendant's Trial Declaration, filed on September 26, 2016, ECF 37, ¶ 3.  Defendant and Lopez entered into negotiations and formed a deal whereby he would be the designated broker for LDT and supervise transactions closed under his real estate broker's license.  *Id.,* ¶ 4.  This deal was memorialized in a written agreement dated April 27, 2009 between Defendant and Lopez on behalf of LDT.  *Id.;* Realty Corporate Branch Associate Agreement between Adrian J. Hernandez of Pacific West Real Estate & Associates and Diana J. Lopez of L.D.T. Investments Inc., Defendant's Trial Exhibit B.  Pursuant to this written agreement, Defendant as LDT's designated broker was expected to supervise transactions closed under his real estate broker license and adhere to the California Department of Real Estate's ("DRE") compliance requirements.  *Id.*  In exchange for Defendant's broker services, LDT was to pay him a flat fee of $1,500.00 per closed transaction.  Defendant's Trial Declaration, ECF 37, ¶ 7.

From May 2009 until February 2011, Defendant was employed as LDT's real estate broker.  Defendant's Trial Declaration, ¶¶ 5 and 18; April 20, 2011 letter from the desk of Adrian Hernandez, Broker re Resignation of responsible broker duties of L.D.T. Investments Inc., Defendant's Trial Exhibit K; *see also,* Admitted Fact 2.1, Joint Pre-trial Stipulation, ECF 24, filed on July 26, 2016 ("On June 13, 2009, Defendant Adrian Hernandez became the designated officer of LDT.").

Defendant testified that during his employment with LDT, he visited LDT's office in Granada Hills, California, once every two weeks, but he never met with any clients of LDT, closed a transaction, or saw a transaction closed. Trial Testimony of Defendant, Transcript of Trial, ECF 48 at 23; Defendant's Trial Declaration, ECF 37, ¶¶ 20 and 21. The court finds that this testimony of Defendant is credible.

Although Defendant testified that he never closed a transaction or saw a transaction closed, Defendant was eventually paid $5,000.00 by Lopez, apparently on behalf of LDT, and that money was distributed to Defendant in the form of two different checks from Lopez as a retainer for his services rather than by LDT as a commission on sales transactions as his employment contract specified. Trial Testimony of Defendant, Transcript of Trial, ECF 48 at 36-37 and 46-47. The court also finds that this testimony of Defendant is credible.

On or about August 25, 2011, the California DRE filed an Order to Desist and Refrain against LDT and Lopez. Admitted Fact 2.7, Joint Pre-trial Stipulation, ECF 24; California Department of Real Estate's Order to Desist and Refrain filed on August 25, 2011, Plaintiffs' Trial Exhibit 1. In its Order to Desist and Refrain against LDT and Lopez, the California Department of Real Estate made certain factual findings against these respondents regarding its mode of operation and discussed Defendant's involvement with LDT as its real estate broker. *Id.* Many of these facts have been stipulated to by the parties. Admitted Facts 2.1 through 2.7, Joint Pre-trial Stipulation, ECF 24.

Using Defendant's real estate broker license, LDT bought properties directly from sellers, including, but not limited to, distressed sellers facing foreclosure due to default on their home loans to institutional lenders. Admitted Fact 2.4, Joint Pre-trial Stipulation, ECF 24; California Department of Real Estate's Order to Desist and Refrain filed on

August 25, 2011, at 4, Findings of Fact, ¶ 8, Plaintiffs' Trial Exhibit 1.  LDT bought these

properties, through the instrumentality of a short term lender, known as a "flash funder,"

who financed LDT's acquisitions.   California Department of Real Estate's Order to Desist

and Refrain filed on August 25, 2011, at 4, Findings of Fact, ¶ 8, Plaintiffs' Trial Exhibit 1.

As such, LDT took title to a property in exchange for an obligation to pay the outstanding

lien owed by the seller to the lienholder.  *Id.*  LDT, using its in-house escrow then

subsequently paid over to the seller the remaining net sale proceeds.  *Id.*

Once LDT obtained the properties into its inventory, LDT "flipped" or quickly resold

its properties to potential buyers.  Admitted Fact 2.5, Joint Pre-trial Stipulation, ECF 24;

California Department of Real Estate's Order to Desist and Refrain filed on August 25,

2011, at 4-5, Findings of Fact, ¶ 9, Plaintiffs' Trial Exhibit 1.  LDT profited on the

difference between the discount price paid by LDT to pay off the institutional lender's lien

on the short sale and the resale price to a new buyer paying cash for the "flipped"

property.  *Id.*  LDT was then obligated to pay off the lien placed on the property by the

flash funder.  *Id.*  LDT bought and inventoried properties and then sold them using either

Diversity Escrow or its in-house escrow, LDT Escrow Division A Non-Independent Broker

Escrow ("LDT Escrow").  Admitted Fact 2.3, Joint Pre-trial Stipulation, ECF 24.  Diversity

Escrow was utilized for the Aldea and Cohasset Subject Properties at issue in this matter,

and LDT Escrow was utilized for the Willow Green, Saticoy and Velicata Subject

Properties at issue in this matter.  *Id.*

LDT neither fulfilled the promise to resell the residences back to the defaulting

homeowners, nor recorded a deed of trust securing the flash funders' security interest in

the short term loan to LDT to acquire the distressed property, nor, after reselling the

property to a new cash buyer, deeded over the property to the buyer free and clear of

liens.  California Department of Real Estate's Order to Desist and Refrain filed on August

25, 2011, at 5, Findings of Fact, ¶ 10, Plaintiffs' Trial Exhibit 1.  LDT failed to record

deeds of trust securing Plaintiffs' security interests in the Subject Properties.  Admitted

Fact 2.6, Joint Pre-trial Stipulation, ECF 24.  The California Department of Real Estate

found that LDT embezzled funds channeled into its escrow from sources including buyer

deposits, flash funder loans, and seller net proceeds, systematically converted for LDT's

and/or Lopez's personal purposes and private concerns totaling approximately

$1,744,537.68 reflecting losses of seven victims, two sellers and five buyers.  California

Department of Real Estate's Order to Desist and Refrain filed on August 25, 2011, at 5,

Findings of Fact, ¶ 12, Plaintiffs' Trial Exhibit 1.

Defendant testified that after not closing a single transaction with LDT and not

receiving any pay from LDT for more than a year, he was "suspicious" of the apparent

lack of transactions and hired an independent auditor, Keith Loughram (the "Auditor"),

with whom he had a business relationship with since 2006, to look into the situation.

Defendant's Trial Declaration, ECF 37, ¶ 15; Trial Testimony of Defendant, Transcript of

Trial, ECF 48 at 59-63.  According to Defendant, he did this because it was his duty as

LDT's associated broker.  *Id*.  Defendant testified that between December 2010 and

January 2011, LDT and Lopez refused to provide the Auditor with documents that the

Auditor requested, at which point the Auditor recommended that Defendant pull his

broker license from LDT.  *Id*.  According to Defendant, he resigned from LDT effective on

February 25, 2011 and had applied to the DRE to have his real estate broker license

removed from LDT's use.  April 20, 2011 letter from the desk of Adrian Hernandez,

Broker re Resignation of responsible broker duties of L.D.T. Investments Inc.,

1  Defendant's Trial Exhibit K.  In April 2011, Defendant sent his resignation letter to LDT.

2  *Id.*  The court finds Defendant's testimony on these points to be credible.

3       Plaintiffs have worked as legal administrators for a law firm for over 10 years each

4  under the supervision of an attorney.  Trial Testimony of Myrna Farias, Transcript of Trial,

5  ECF 48 at 109; Trial Testimony of Jaime Farias, Transcript of Trial, ECF 48 at 134-135.

6
   As such, Plaintiff Myrna Farias testified that Plaintiffs were "not normally in the habit of
7
   signing a contract without reading it" and would have raised concerns, if any arose, prior
8
9  to signing the contract.  Trial Testimony of Myrna Farias, Transcript of Trial, ECF 48 at

10 109; *Id*.

11      Plaintiffs had approximately 40 real estate transactions with LDT, most of which

12 were profitable, except for five transactions that are the subject of the present proceeding

13 involving the "Subject Properties."  Trial Testimony of Myrna Farias, Transcript of Trial,

14
   ECF 48 at 90-93.  Plaintiffs' transactions with LDT were purchases of real property by
15
   them from LDT Investments and were not loans to LDT.  *Id.* at 94-96  Plaintiffs'
16
17 transactions with LDT closed prior to transactions involving the Subject Properties yielded

18 a profit of approximately $500,000.00, but due to their reinvestment in further

19 transactions with LDT involving the Subject Properties, Plaintiffs were "net loser[s]" due to

20 losses from the later transactions with net losses of over $1 million.  Trial Testimony of

21 Jaime Farias, Transcript of Trial, ECF 48 at 147 and 164.

22
        Plaintiff's transactions with LDT involving the Subject Properties included the
23
   following parcels of real property identified by street address: (1) 10347 Aldea Avenue,
24
25 Granada Hills, California 91344 ( the "Aldea Property") in which the Plaintiffs invested

26 $215,000.00 on October 15, 2010, *see* Copy of the check for $215,000.00 Payable to

27 Diversity Escrow for the Aldea Property, Plaintiffs' Trial Exhibit 3; Sale Escrow

28

Instructions for the Aldea Property, Plaintiffs' Trial Exhibit 4; Buyer/Borrower Statement

Final for the Aldea Property, Plaintiffs' Trial Exhibit 5; Deed of Trust for the Aldea

Property recorded on 3/20/2008 for $64,875.00, Plaintiffs' Trial Exhibit 7; Deed of Trust

for the Aldea Property recorded on 3/20/2008 for $346,000.00; (2) 11941 Cohasset St.,

North Hollywood, California 91605 (the "Cohasset Property") in which the Plaintiffs

invested $140,175.00 on December 21, 2010, *see* Copy of the check for $280,350.00

Payable to Diversity Escrow re Cohasset Property, Plaintiffs' Trial Exhibit 10; Sales

Escrow Instructions for the Cohasset Property, Plaintiffs' Trial Exhibit 11; Buyer/Borrower

Statement Final for the Cohasset Property, Plaintiffs' Trial Exhibit 12; Grant Deed for the

Cohasset Property recorded on 1/28/2011, Plaintiffs' Trial Exhibit 13; Deed of Trust for

the Cohasset Property recorded on 8/24/2010, Plaintiffs' Trial Exhibit 14; June 15, 2011

letter from Robert W. Clemmer to David Greenberg re Ortega Loan (Cohasset Property),

Plaintiffs' Trial Exhibit 15; Trustee's Deed Upon Sale for the Cohasset Property, Plaintiffs'

Trial Exhibit 16; (3) 14532 Willow Green Lane, Sylmar, California 91342 (the "Willow

Property") purchased by the Plaintiffs for $255,000.00 on March 2, 2011, *see* Copy of the

check for $255,000.00 to LDT Escrow for the Willow Green Property, Plaintiffs' Trial

Exhibit 18; Letter from Myrna Farias address to Diana Lopez with LDT Escrow, Plaintiffs'

Trial Exhibit 19; (4) 18237 Saticoy Street, Reseda, California 91355 (the "Saticoy

Property") purchased by the Plaintiffs for $295,060.00 on March 10, 2011, *see* Copy of

the checks for $200,060.00 and $95,000.00 for the Saticoy Property, Plaintiffs' Trial

Exhibit 20; Note Secured by Deed of Trust for the Saticoy Property dated 3/10/2011,

Plaintiffs' Trial Exhibit 21; Letter from Myrna Farias addressed to Diana Lopez with LDT

Investment re the Saticoy Property, Plaintiffs' Trial Exhibit 22; and (5) 21401 Velicata

Street, Woodland Hills, California 91364 (the "Velicata Property") purchased by the

9

1  Plaintiffs for $240,000.00 on March 16, 2011, *see* Copy of the check for $240,000.00

2  payable to LDT Escrow for the Velicata Property, Plaintiffs' Trial Exhibit 23; Trustee's

3  Deed Upon Sale for the Velicata Property recorded on September 19, 2011, Plaintiffs'

4  Trial Exhibit 24; Grant Deed for the Velicata Property recorded on 3/22/2011, Plaintiffs'

5  Trial Exhibit 25.  In total, Plaintiffs invested $1,145,235.00 with LDT to purchase the

6  Subject Properties.  *Id.*

7          Plaintiffs made the investments in the Aldea and Cohasset properties by writing a

8  check to Diversity Escrow ("Diversity"), also owned and operated by Lopez.  Copy of the

9

10  check for $215,000.00 Payable to Diversity Escrow for the Aldea Property, Plaintiffs' Trial

11  Exhibit 3; Copy of the check for $280,350.00 Payable to Diversity Escrow re Cohasset

12  Property, Plaintiffs' Trial Exhibit 5.  Prior to closing on the Aldea and Cohasset properties,

13  Plaintiffs each signed Sale and Escrow Instructions.  Sale and Escrow Instructions for the

14  Aldea Property, Plaintiffs' Trial Exhibit 3; Sale and Escrow Instructions for the Cohasset

15  Property, Plaintiffs' Trial Exhibit 11. The Sale and Escrow Instructions for these properties

16  expressly stated "NO REAL ESTATE BROKER INVOLVED: . . . there are NO Real

17

18  Estate Brokers involved in this transaction."  *Id.*  Defendant was not an employee nor an

19  officer of Diversity Escrow, the entity to which the Plaintiffs wrote and delivered these

20  checks for their transactions with LDT for the Aldea Property on October 15, 2010, and

21  for the Cohasset Property on December 21, 2010.  Copy of the check for $215,000.00

22  Payable to Diversity Escrow for the Aldea Property, Plaintiffs' Trial Exhibit 3; Copy of the

23  check for $280,350.00 Payable to Diversity Escrow re Cohasset Property, Plaintiffs' Trial

24

25  Exhibit 5; Defendant's Trial Declaration, ECF 37, ¶ 11.

26          Plaintiffs purchased the Willow, Saticoy, and Velicata properties by writing

27  separate checks to LDT.  Copy of the check for $255,000.00 to LDT Escrow for the

28

10

Willow Green Property, Plaintiffs' Trial Exhibit 18; Copy of the checks for $200,060.00 and $95,000.00 for the Saticoy Property, Plaintiffs' Trial Exhibit 20; Copy of the check for $240,000.00 to LDT Escrow for the Velicata Property, Plaintiffs' Trial Exhibit 23. Defendant's resignation and application to DRE were prior to Plaintiffs' purchases of the Willow, Saticoy, and Velicata properties through LDT, on March 2, 2011, March 10, 2011, and March 16, 2011, respectively. *Id.* Defendant had resigned from LDT on February 25, 2011, though Defendant sent a formal resignation on April 20, 2011, and Defendant had applied to the DRE on February 17, 2011 to remove his license from LDT, declaring that he would no longer be the licensed broker for LDT. State of California Department of Real Estate Corporation Change Application for L.D.T. Investments, Inc., Defendant's Trial Exhibit J; April 20, 2011 letter from the desk of Adrian Hernandez, Broker re Resignation of responsible broker duties of L.D.T. Investments Inc., Defendant's Trial Exhibit K.

Plaintiffs claim that LDT, Lopez, and Defendant are liable for Plaintiffs' losses from the transactions involving the Subject Properties because they misrepresented that the Subject Properties had "free and clear" title and that the Subject Properties were owned by LDT. Trial Testimony of Jaime Farias, Transcript of Trial, ECF 48 at 126-129; Trial Declaration of Jaime Farias, filed on September 7, 2016, ECF 34, ¶¶ 13(a), (b), (c), (d) and (e). Specifically, regarding Defendant, Plaintiffs claim that he is liable for their losses on the transactions involving the Subject Properties because he induced them to purchase the Subject Properties by failing to mention that each of the Subject Properties was encumbered by lien, foreclosure or true ownership. *Id.*

Defendant contends that he is not liable for any losses by Plaintiffs because he had never met them, or had knowledge of them, prior to their filing of this adversary

action on November 6, 2015. *See* Defendant's Trial Declaration, ECF 37, ¶¶ 23 and 24;

Trial Testimony of Defendant, Transcript of Trial, ECF 48 at 51. The court finds

Defendant's testimony on this point to be credible, especially in considering Plaintiffs' trial

testimony that they only perhaps met him once as discussed below.

Plaintiff Jaime Farias admitted at trial that he only met Defendant once at the

Informational Meeting. Trial Testimony of Jaime Farias, Transcript of Trial, ECF 48 at

120-121 and 158. Plaintiff Myrna Farias only met him once at the Informational Meeting,

but saw him in the LDT offices 10 times. Trial Testimony of Myrna Farias, Transcript of

Trial, ECF 48 at 97-99, 180, 190-191.

In October 2010, Plaintiffs attended what Plaintiffs referred to as an in-person

"investment presentation" or informational meeting (the "Informational Meeting") at LDT's

offices located in Granada Hills. Trial Declaration of Jaime Farias, ECF 34, ¶ 14.

Plaintiffs testified that Lopez, Lopez's step-sister, Theresa Lopez, Defendant, and Tom

Armas (spelled phonetically) attended the Informational Meeting, in October 2010. Trial

Testimony of Myrna Farias, Transcript of Trial, ECF 48 at 97-99; Trial Testimony of Jaime

Farias, Transcript of Trial, ECF 48 at 118-121 and 127. Plaintiffs testified that at the

Informational Meeting, employees or officers of LDT explained how they conducted

business, specifically noting that LDT "flips" properties, participates in short sales, and

has connections to a bank that could provide a list of distressed properties in which the

Plaintiffs could invest. Trial Testimony of Jaime Farias, Transcript of Trial, ECF 48 at

119. Plaintiff Jaime Farias testified that this meeting lasted 30 to 45 minutes. *Id.,* ECF

48 at 121. While Plaintiffs met "everybody" at LDT at the Informational Meeting, their

primary contact at LDT was Lopez, and each of their 40 transactions with LDT was

entered into with Lopez. *Id.,* ECF 48 at 155-156.

According to Plaintiff Jaime Farias, Lopez stated at the Informational Meeting that "[LDT has] a broker who handles all the transactions."  *Id*.  Plaintiff Jaime Farias testified that he expected to have a broker involved in all LDT real estate transactions and would not have done business with LDT had no licensed broker been involved.  *Id.,* ECF 48 at 119-120.

Mr. Farias testified that both Lopez and Defendant told him that Defendant was the broker for LDT.  *Id.*  Mr. Farias was then asked: "What else do you recall, if anything, about what Mr. Hernandez told you that day?"  *Id.,* ECF 48 at 121.  Mr. Farias responded: "He [Defendant] explained what he did, the location, and how they obtain properties and the process.  And they also had a buyer in place."  *Id.*  Finally, Mr. Farias was asked: "And anything else again specifically that Mr. Hernandez represented to you as opposed to Diana Lopez or someone else?"  *Id.*  Mr. Farias answered: "More specifically no but everybody was saying something different in regards to for instance we obtained - - we have an inside connection at the bank that will give us a list of properties.  We also have somebody that goes through the steps of the court to bid for the properties.  And also that they have clients coming in requesting short sales, requesting help to get another property so do short sale with the banks."  *Id.*

Mrs. Farias testified that several people at LDT presented her with lists of distressed properties, including Lopez, her step-sister, Teresa Lopez and Defendant.  Trial Testimony of Myrna Farias, Transcript of Trial, ECF 48 at 94-95.  When Mrs. Farias was asked: "Can you recall when Adrian Hernandez presented you with a list of distressed properties for potential investment?"  *Id.,* ECF 48 at 95.  Mrs. Farias responded:  "I don't recall."  *Id.*

Most of Plaintiffs' transactions with LDT were entered into by Mrs. Farias for Plaintiffs and by Lopez for LDT. *Id.* Mr. Farias only went to the LDT office between five and ten times and met with Lopez only a few times, and he recalled that Lopez would show Plaintiffs a list of properties and cities which were available for transactions. *Id., ECF 48 at 156-158.* As Plaintiff Jaime Farias testified, Plaintiffs did not have any discussions with Adrian Hernandez on or about the specific transactions with LDT relating to the Subject Properties before they invested in these properties. *Id.,* ECF 48 at 166-167. Mr. Farias further testified that Plaintiffs primarily dealt with Lopez at LDT. Trial Testimony of Jaime Farias, Transcript of Trial, ECF 48 at 155-157.

## DISCUSSION

### A. Plaintiffs Have Not Proven Their Claim against Defendant under 11 U.S.C. § 523(a)(2)(A) by a Preponderance of the Evidence.

A "debt for money, property, services, or an extension, renewal, or refinancing of credit" is nondischargeable to the extent the debt was obtained by false pretenses, a false representation or actual fraud. 11 U.S.C. § 523(a)(2)(A). In order to prevail on a claim under 11 U.S.C. § 523(a)(2)(A), the Ninth Circuit has consistently held that a creditor must demonstrate "five elements, each of which the creditor must demonstrate by a preponderance of the evidence: (1) misrepresentation, fraudulent omission or deceptive conduct by the debtor; (2) knowledge of the falsity or deceptiveness of his statement or conduct; (3) an intent to deceive; (4) justifiable reliance by the creditor on the debtor's statement or conduct; and (5) damage to the creditor proximately caused by its reliance on the debtor's statement or conduct." *Turtle Rock Meadows Homeowners Association v. Slyman (In re Slyman)*, 234 F.3d 1081, 1085 (9th Cir. 2000)(citations

14

omitted); *accord, Williams v. Sato (In re Sato)*, 512 B.R. 241, 247 (Bankr. C.D. Cal. 2014).

As to the first element of misrepresentation, fraudulent omission or deceptive conduct, Plaintiffs contend that in October 2010, they went to the offices of LDT for an in-person informational meeting, which included Lopez, Defendant and others at this meeting, Defendant presented them with a list of properties that LDT allegedly owned, the list of properties included properties from Oxnard, San Bernardino, Los Angeles and other parts of Southern California, and they told Defendant that they wanted to invest in properties in the Los Angeles area.  Plaintiffs' [Proposed] Findings of Fact and Conclusions of Law, ECF at 6, *citing,* Trial Declaration of Jaime Farias, ECF 34, ¶ 14. According to Plaintiff Jaime Farias, Defendant then presented Plaintiffs with properties in the greater Los Angeles area and told them that the properties they were viewing had no encumbrances*,* or if they did, had encumbrances for a very minimal amount.  *Id., citing,* Trial Declaration of Jaime Farias, ECF 34, ¶ 15.  According to Mr. Farias, at this meeting, Defendant explained what he did, the location and how they [i.e., LDT] obtained properties and the process, and that they had a buyer in place, and that it was represented to Plaintiffs that LDT had "an inside connection at the bank that will give us a list of properties . . . we also have somebody that goes through the steps of the court to bid for the properties . . . also that they have clients coming in requesting short sales, requesting help to get another property. . . ."  *Id., citing,* Trial Testimony of Plaintiff Jaime Farias at 121, lines 5-7 and 11-17.

Plaintiffs' evidence in support of the alleged misrepresentations by Defendant cited in support of their proposed finding of fact of a misrepresentation consists of two short paragraphs in Mr. Farias's trial declaration and nine lines of testimony in the trial

transcript.  In paragraph 14 of his trial declaration, Mr. Farias stated: "On or about

October 2010, for each of these property transactions, I went to the offices of LDT for an

in-person investment presentation led by Defendant.  At this meeting Defendant

presented me with a list of properties that LDT allegedly owned.  This list of properties

contained properties from Oxnard, San Bernardino, Los Angeles, and other parts of

Southern California.  I told Defendant that I was interested to invest in properties in the

Los Angeles area."  Trial Declaration of Jaime Farias, ECF 34, ¶ 14.  In paragraph 15 of

his trial declaration, Mr. Farias stated: "Defendant then presented me with properties in

the greater Los Angeles area and told me that those properties had no encumbrances, or

if they did, had encumbrances for a very minimal amount."  Trial Declaration of Jaime

Farias, ECF 34, ¶ 15.

  The trial testimony of Mr. Farias cited in support of Plaintiffs' allegation of

misrepresentation by Defendant was on page 131 of the trial transcript at lines 5-7 and

11-17:

  Q  What else do you recall, if anything, about what Mr. Hernandez told you that

  day?

  A  He explained what he did, the location, and how they obtain properties and the

  process.  And they also had a buyer in place.

  Q  Okay.  And anything else again specifically that Mr. Hernandez represented to

  you as opposed to Diana Lopez or someone else?

  A  More specifically no but everybody was saying something different in regards to

  for instance we obtained - - we have an inside connection at the bank that will give

  us a list of properties.  We also have somebody that goes through the steps of the

  court to bid for the properties.  And also that they have clients coming in

16

1

2

requesting short sales, requesting help to get another property so do short sale
with the banks.

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

The only evidence of Defendant's alleged misrepresentations made to Plaintiffs is
their rather brief testimony relating of alleged oral representations made by him.   Mr.
Farias testified that Defendant showed him a list of properties in the greater Los Angeles
area, but there is no evidence that this alleged list had any of the five Subject Properties,
which relate to the alleged fraud by LDT.   Plaintiffs did not give any testimony that any of
the Subject Properties were on this alleged list.   According to Plaintiffs' trial declarations,
Defendant had represented that the properties on the list had no or minimal
encumbrances, but they did not provide evidence of this list or any evidence
corroborating that Defendant made any such statements, and they never testified that
any of the Subject Properties were on the list or that any of their transactions with LDT
regarding the Subject Properties were conducted at the Informational Meeting.   As
Plaintiffs acknowledged, the Informational Meeting was short, lasting 30 to 45 minutes,
and the purpose of the meeting was informational and not about specific transactions.   It
is not credible that Plaintiffs invested $1 million in the Subject Properties based on a 30
or 45 minute initial informational meeting, but through a number of meetings that Mrs.
Farias had with Lopez at the LDT office in the months that followed as she described in
her testimony.   At those subsequent meetings, Mrs. Farias testified that she saw, but did
not speak, with Defendant, which indicates that he did not make any representations to
her on those occasions.

25

26

27

Plaintiffs testified that Defendant "explained what he did, the location, and how
they obtain properties and the process [a]nd they also had a buyer in place."   Mr. Farias
testified that he could not recall anything more specific what Defendant said to him,

28

commenting that "everyone [at LDT] was saying something different." This testimony of

Plaintiffs is insufficient to show that Defendant made any specific statements that could

be construed as misrepresentations because they have not offered credible evidence of

what Defendant specifically said to them and how such statements were false or

misleading. Moreover, there is nothing to show that any of these general statements that

were allegedly made by Defendant related to any of the Subject Properties. Mr. Farias's

comments that "everyone was saying something different" indicate that there were

multiple speakers at the Informational Meeting at LDT, who may have included

Defendant, and who may have said many different things, but as indicated by their

testimony, Plaintiffs cannot specifically recall who said what, especially Defendant.

While Plaintiffs may have met Defendant at the Informational Meeting at LDT,

there is no credible evidence to show that Defendant made any specific representation to

them relating to the transactions with LDT for the Specific Properties for which they claim

losses. Defendant testified that he never met with Plaintiffs, and the court finds that his

testimony is accurate because he may have only met with them in a group setting at the

Informational Meeting and not on any one-on-one setting to discuss specific property

transactions. Based on the foregoing, the court finds that Plaintiffs have not proven the

first element of a representation by Defendant for a claim for fraud under 11 U.S.C. §

523(a)(2)(A) by a preponderance of the evidence because Plaintiffs did not offer credible

evidence regarding any specific false or deceptive representation made by the

Defendant. Given that Plaintiffs cannot even show that Defendant made specific

representations to them that were false or fraudulent, they cannot show the other

elements of a claim under 11 U.S.C. § 523(a)(2)(A), including knowledge, intent,

justifiable reliance or proximate cause of their damages. Accordingly, the court finds that

1   Plaintiffs have not met their burden to prove by a preponderance of the evidence that

2   Defendant made false representations with knowledge and intent to deceive upon which

3   Plaintiffs justifiably relied, resulting in damages proximately caused thereon.  *In re*

4   *Slyman*, 234 F.3d at 1084.  Accordingly, the court finds that Plaintiffs have not proven

5   their claim for relief under 11 U.S.C. § 523(a)(2)(A) by a preponderance of the evidence.

6   **B.  Plaintiffs Have Not Proven Their Claim against Defendant under 11 U.S.C. §**
7       **523(a)(4) by a Preponderance of the Evidence.**

8
9       11 U.S.C. § 523(a)(4) "provides that debts that arise from 'fraud or defalcation

10  while [the debtor was] acting in a fiduciary capacity, embezzlement, or larceny,' are

11  nondischargeable."  *Ragdale v. Haller,* 780 F.2d 794, 795-796 (9th Cir. 1986)(alteration in

12  original), *cited and quoted in, Houng v. Tatung Company, Ltd. (In re Houng)*, 636 Fed.

13  Appx. 396, 398 (9th Cir. 2016).  Whether a party is "acting in a fiduciary capacity" is a

14  question of federal law.  *Id.*  The Ninth Circuit has "adopted a narrow definition of
15
    'fiduciary' for purposes of § 523(a)(4)" as a type of relationship "arising from an express
16
17  or technical trust that was imposed before, and without reference to the wrongdoing that

18  caused the debt."  *Cal-Micro, Inc. v. Cantrell (In re Cantrell)*, 329 F.3d 1119, 1125 (9th Cir.

19  2003), *cited and quoted in, In re Houng*, 636 Fed. Appx. at 398.  A broadly interpreted or

20  generalized definition of acting in a "fiduciary" capacity, such as a relationship involving

21  trust and good faith, is inapplicable in the context of a bankruptcy discharge.  *Double*
22
    *Bogey, L.P., v. Enea*, 794 F.3d 1047, 1050 (9th Cir. 2015), quoting *Ragsdale v. Haller*,
23
24  780 F.2d at 796.  Fraud for purposes of 11 U.S.C. § 523(a)(4) means actual fraud, but

25  does not differ from actual fraud required for a claim of nondischargeability under 11

26  U.S.C. § 523(a)(2)(A).  4 March, Ahart and Shapiro, *California Practice Guide:*

27  *Bankruptcy,* ¶¶ 22:630 and 22:631 at 22-100 (2016), *citing inter alia, In re Roussos,* 251

28

B.R. 86, 91 (9th Cir. BAP 2000) and *In re Dakota,* 284 B.R. 711, 723 n. 10 (Bankr. N.D.

Cal. 2002).  "Defalcation is generally defined as the misappropriation of trust funds or

money held in any fiduciary capacity."  4 March, Ahart and Shapiro, *California Practice

Guide: Bankruptcy,* ¶ 22:632 at 22-100, *citing, In re Lewis,* 97 F.3d 1182, 1186-1187 (9th

Cir. 1996).

Plaintiffs allege that Defendant is liable to them on their claim under 11 U.S.C. §

523(a)(4) because he owed a fiduciary duty to them because LDT used his real estate

broker's license to purchase the Subject Properties for them, he personally undertook the

responsibility for supervising all the real estate transactions and escrow activities of LDT

to ensure compliance with the standards required by California law and California

Department of Real Estate regulations, he consciously disregarded a substantial and

unjustifiable risk in not adequately supervising LDT's staff and its escrow accounts, and

he would have had discovered LDT's serious transgressions if he had been more diligent

and proactive during his visits at LDT.  Plaintiffs' [Proposed] Findings of Fact and

Conclusions of Law, ECF 58, lodged on February 7, 2017, at 6, *citing,* Trial Declaration of

Jaime Farias, ECF 34, ¶ 14.  Plaintiffs are essentially alleging that Defendant is liable to

them for fraud or defalcation while acting in a fiduciary duty.

Plaintiffs' evidence is insufficient to show by a preponderance of the evidence that

Defendant committed fraud or defalcation while acting in a fiduciary duty to them.  First,

there is insufficient evidence that Defendant had a fiduciary duty to them as a real estate

broker.  With respect to Plaintiff's first two transactions with LDT relating to the Subject

Properties, the Aldea and Cohasset properties, Plaintiffs each signed Sale and Escrow

Instructions, which expressly stated "NO REAL ESTATE BROKER INVOLVED: . . . there

are NO Real Estate Brokers involved in this transaction."   Sale Escrow Instructions for

the Aldea Property, Plaintiffs' Trial Exhibit 4; Sale Escrow Instructions for the Cohasset Property, Plaintiffs' Trial Exhibit 11.  There is no other evidence offered by Plaintiffs showing that Defendant was involved in the transactions for these properties.  Plaintiffs' testimony that Defendant was responsible for these transactions based on the "Information Meeting" is insufficient to establish a causal nexus between that meeting and these transactions.

As to the other three of the Subject Properties, the Willow, Saticoy and Velicata properties, Plaintiffs have not offered sufficient evidence showing that Defendant was involved in any of these transactions for these properties.  Defendant had resigned as the broker for LDT on February 25, 2011, which occurred before Plaintiffs' purchase of the Willow, Saticoy, and Velicata properties through LDT, on March 2, 2011, March 10, 2011, and March 16, 2011.

Plaintiffs have not offered any evidence of an express or technical trust between them and Defendant.  Plaintiffs allege in their complaint that Defendant "failed to be honest, truthful, and fair" and that he "failed to act in good faith," factors only considered under the broad or generalized definition of a "fiduciary" relationship.  *See* Plaintiffs' Complaint, ECF 1, ¶ 100.  Plaintiffs offer no evidence showing that Defendant acted in a fiduciary capacity as to them, such as being the broker on the specific transactions relating to the Subject Properties.  Plaintiffs' documentary evidence for those transactions do not show that Defendant was involved in any of those transactions as a real estate broker and in any other capacity.  Defendant testified that he never met with Plaintiffs, let alone acted on their behalf, and his testimony on these points is credible since it appears that Lopez never told him of any real estate transactions conducted by LDT.

Further, in interpreting 11 U.S.C. § 523(a)(4), "acting in a fiduciary capacity" does not qualify the words "embezzlement" or "larceny" used in that section, and therefore, *any* debt resulting from embezzlement or larceny falls within the exception of the clause.  *In re Littleton*, 942 F.2d 551, 555 (9th Cir. 1991).  "Embezzlement is the fraudulent appropriation of property by one to whom it is entrusted or into whose hands it has lawfully come."  4 March, Ahart and Shapiro, *California Practice Guide: Bankruptcy,* ¶ 22:640 at 22-101 (2016), *citing inter alia, In re Littleton,* 942 F.2d at 555.  Embezzlement requires: (1) property to be rightfully in the possession of a non-owner; (2) non-owner's appropriation of the property to a cause other than that for which it was entrusted; and (3) circumstances indicative of fraud.  *In re Littleton,* 942 F.2d at 555; *In re Wada,* 210 B.R. 572, 576 (9th Cir. BAP 1997).  Larceny under the federal common law, which the court may look to as opposed to state law, is a "felonious taking of another's personal property with the intent to convert it or deprive the owner of the same."  *In re Ormsby,* 591 F.3d 1199, 1205 (9th Cir. 2010), *cited and quoted in,* 4 March, Ahart and Shapiro, *California Practice Guide: Bankruptcy,* ¶ 22:650 at 22-102.  "Felonious" means "proceeding from an evil heart or purpose; malicious; villainous. . . Wrongful; (of an act) done without color of right."  *In re Ormsby,* 591 F.3d at 1205 n. 4, *cited and quoted in,* 4 March, Ahart and Shapiro, *California Practice Guide: Bankruptcy,* ¶ 22:650 at 22-102.  Embezzlement or larceny are not appropriate here to support a claim under 11 U.S.C. § 524(A)(4) since there is no evidence showing that Defendant ever possessed or took Plaintiffs' property as the money which Plaintiffs lost were transmitted by them in their real estate purchases of the Subject Properties went to Diversity Escrow and LDT Escrow entities controlled by Lopez in which Defendant had no interest.

1   Accordingly, the court finds that Plaintiffs have not proven their claim for relief

2   under 11 U.S.C. § 523(a)(4) by a preponderance of the evidence.

3   **C.  Plaintiffs Have Not Proven Their Claim against Defendant under 11 U.S.C.**

4   **§ 523(a)(6) by a Preponderance of the Evidence.**

5

6   Under 11 U.S.C. § 523(a)(6), an individual debtor may not discharge a debt to

7   the extent that such debt was obtained "for willful or malicious injury by the debtor to

8   another" or "to the property of another."  "Willful" means "voluntary" or "intentional,"

9   *Kawaauhau v. Geiger*, 523 U.S. 57, 61-62 (1998), *citing,* Restatement (Second) of

10  Torts, §8A, comment A (1964).   A willful injury is not merely recklessness or

11  negligence, but rather requires "a deliberate or intentional *injury*, not merely . . . a

12  deliberate or intentional *act* that leads to injury."  *Kawaauhau v. Geiger*, 523 U.S. at 61

13  (emphasis in original).  An injury is "willful" "when it is shown either that the debtor had

14  a subjective motive to inflict the injury *or* that the debtor believed that injury was

15  substantially certain to occur as a result of his conduct."  *Petralia v. Jercich (In re*

16  *Jercich)*, 238 F.3d 1202, 1208 (9th Cir. 2001) (emphasis in original).  "Willful" intent

17  does not require that the debtor had the specific intent to injure the creditor, if the act

18  was intentional and the debtor knew that it would necessarily cause injury.  *Id*. at

19  1207.  This standard focuses on the debtor's subjective intent, and not "whether an

20  objective, reasonable person would have known that the actions in question were

21  substantially certain to injure the creditor."  *Carillo v. Su (In re Su)*, 290 F.3d 1140,

22  1145-1146 (9th Cir. 2002).

23  The "malicious" injury requirement is separate from the "willful" requirement.

24  *In re Su*, 290 F.3d at 1146.  An injury is "malicious" if it involves "(1) a wrongful act,

25  (2) done intentionally, (3) which necessarily caused injury, and (4) is done without

26  just cause or excuse."  *In re Jercich*, 238 F.3d at 1209, *citing*, *Murray v. Bammer (In*

27  *re Bammer)*, 131 F.3d 788, 791 (9th Cir. 1997).  This definition "does not require a

28

showing of biblical malice, i.e. personal hatred, spite, or ill-will." *In re Bammer*, 131
F.3d at 791.

Plaintiffs contend that Defendant's conduct gives rise to a claim under 11 U.S.C. §
523(a)(6) for willful and malicious injury because he had a financial arrangement with
LDT where he would be compensated $1,500 for each transaction, he admitted that he
was compensated $5,000 by LDT for some of the transactions, he misled Plaintiffs by
failing to disclose material information to them and intentionally gave them false
information at a 2010 meeting and presided over a large scam that defrauded not just
them but many other investors.  Plaintiffs' [Proposed] Findings of Fact and Conclusions of
Law, ECF 58 at 6, *citing,* Defendant's Trial Declaration, ECF 37, ¶ 7, Trial Testimony of
Defendant, Transcript of Trial at 36, line 14 and Plaintiffs' Trial Exhibits 1 and 2.  Plaintiffs
further allege that Defendant's conduct was willful and malicious because he failed to
make an appropriate escrow demand on their behalf, failed to make any payment
personally, failed to cause LDT to make payments, failed to supervise LDT's employees,
failed to obtain reimbursement when title to the Subject Properties was not properly
conveyed to Plaintiffs and knew that he defrauded Plaintiffs and that LDT had little, if any,
chance of ever repaying their investment.  Plaintiffs' [Proposed] Findings of Fact and
Conclusions of Law, ECF 58 at 6, *citing,* Trial Testimony of Defendant (without citation to
specific testimony).

Defendant's testimony is that he did not meet Plaintiffs before this adversary case,
and thus, he could not have deliberately or intentionally caused injury to the Plaintiffs.
*See* Defendant's Trial Declaration, ECF 37, ¶¶ 23 and 24.  Moreover, Defendant's
testimony that he was not aware of the transactions being closed between LDT and
Plaintiffs is credible, and thus, Defendant did not have had the requisite subjective intent

to cause harm or even the knowledge that harm could result to the Plaintiffs since the evidence indicates that he was not involved in any of the transactions. *See* Defendant's Trial Declaration, ECF 37, ¶ 12. Even considering the conflict in the testimony whether Plaintiffs and Defendant did in fact meet at the Informational Meeting, Plaintiffs completely fail to provide credible evidence that Defendant was involved in the specific transactions with LDT relating to the Specific Properties that led to Plaintiffs' alleged injury. While Defendant should have supervised Lopez more carefully, this would have been only negligence on his part and not willful and malicious action with subjective intent to harm Plaintiffs as they alleged in their claim under 11 U.S.C. § 523(a)(6). Defendant's Trial Declaration, ECF 37, ¶¶ 12-14, ECF 37; s*ee also, Kawaauhau v. Geiger*, 523 U.S. at 61-62.

Regarding the Defendant maliciously causing injury to the Plaintiffs, Plaintiffs' testimony is unclear as to who specifically committed a wrongful act, whether it was Defendant, Lopez or someone else at LDT. The wrongful acts at issue here are as follows: (1) the Subject Properties were misrepresented as having "free and clear title;" and (2) the Subject Properties were misrepresented as being owned by LDT (collectively the "Wrongful Acts"). Plaintiffs do not offer credible evidence alleging that specifically the Defendant committed, let alone intentionally committed, any of the Wrongful Acts. While it does appear that the Wrongful Acts occurred and necessarily caused Plaintiffs to lose their $1,145,235.00 investment, the record here shows that Defendant had no knowledge of, and involvement in, the transactions regarding the Subject Properties in which the Plaintiffs had invested, nor was he an employee or officer of either LDT or Diversity Escrow at the time the Plaintiffs invested in the Subject Properties. Defendant's Trial Declaration, ECF 37, ¶ 12. Given Defendant's lack of knowledge and involvement

regarding the Plaintiffs' transactions with LDT, the intent element, required for a showing

of malice, is not met.  Plaintiffs had the burden to prove by a preponderance of the

evidence that the Defendant acted both willfully and maliciously toward the Plaintiffs, but

Plaintiffs have failed to provide credible evidence to support either willfulness or malice.

Accordingly, the court finds that Plaintiffs have not proven their claim for relief under 11

U.S.C. § 523(a)(6) by a preponderance of the evidence.

### CONCLUSION

For the foregoing reasons, the court determines that Plaintiffs have not met their

burden to prove their claims under 11 U.S.C. §§ 523(a)(2)(A), (a)(4) and (a)(6) alleged in

their adversary complaint by a preponderance of the evidence.  A separate judgment

denying and dismissing Plaintiffs' claims with prejudice is being entered concurrently

herewith.

IT IS SO ORDERED.

### ###

Date: August 25, 2017

_____

Robert Kwan
United States Bankruptcy Judge